IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02611-PAB-BNB

ECHOSTAR SATELLITE, L.L.C., a Colorado limited liability company,

Plaintiff and Counterclaim Defendant,

v.

SPLASH MEDIA PARTNERS, L.P., a Texas limited partnership,
SPLASH GP, INC., a Texas corporation,
MARC SPARKS, an individual, and
CHRIS KRAFT, an individual,

Defendants and Counterclaimants.

---

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on defendants Splash Media Partners, L.P.,

Splash GP, Inc., Marc Sparks, and Chris Kraft's motions for summary judgment [Docket

Nos. 116, 137, 175]. The Court's subject-matter jurisdiction is premised upon the

existence of complete diversity of citizenship and an amount in controversy in excess of

$75,000. *See* 28 U.S.C. § 1332(a) (2006).

## I. BACKGROUND

### A. Factual Background

EchoStar Satellite, L.L.C. ("EchoStar") is engaged in the business of providing

and distributing direct satellite broadcast signals of video programming to subscribers.

Defendants Chris Kraft and Mark Sparks are involved in the production and distribution

of programming content that can be distributed by carriers such as EchoStar.

Defendants Kraft and Sparks formed defendant Splash Media Partners, L.P. ("Splash Media Partners") as a Texas limited partnership on or about December 2, 2004. The partnership agreement lists defendants Kraft and Sparks as the only limited partners and defendant Splash GP, Inc. as the only general partner. *See* Defs.' Mot. for Partial Summ. J. on Pl.'s Second, Third & Fourth Claims [Docket No. 116] ("Defs.' First Summ. J. Mot."), ex. 1 at 4. Defendants Kraft and Sparks were officers, directors, and shareholders of Splash GP, Inc.

EchoStar and Splash Media Partners entered into a Business Television Integrator Master Agreement ("BTIMA") that was effective as of December 17, 2004. Under the BTIMA, EchoStar agreed to transmit television content provided to it by Splash Media Partners in exchange for payment. The BTIMA's introductory paragraph identifies Splash Media Partners as a Texas limited partnership. Defendant Chris Kraft signed the BTIMA as "Partner," not in his personal capacity. Defendant Sparks did not sign the BTIMA at all.

Initially, defendants claimed in their pleadings and elsewhere that defendant Splash Media Partners was the owner of various assets related to the production and distribution of the programming content that EchoStar broadcasted under the BTIMA. In November 2008, however, defendants retracted this statement and, instead, began to claim that a different entity was and had always been the actual owner of the assets in question. That entity, known as Splash Media, L.P., is not a party to either the BTIMA or this case. Defendants contend the Splash Media Partners, on the other hand, does not own and never has owned the assets in question.

2

## B. Procedural Background

EchoStar originally filed this case on December 14, 2007 [Docket No. 1], asserting six claims for relief against the defendants. On January 28, 2008, defendants filed their answer to the complaint, together with a counterclaim for breach of contract [Docket No. 7]. Soon after defendants revealed in 2008 that they were changing their position on the ownership of the production and distribution assets, EchoStar filed a motion [Docket No. 54] to amend its complaint, which the Court later granted [Docket No. 121]. The amended complaint [Docket No. 128] contains seventeen claims – the original six plus eleven new claims which allege fraudulent activity and attempt to nullify defendants' limited-liability protections.

Defendants also filed a motion [Docket No. 78] seeking to amend their pleadings, which the Court also granted [Docket No. 121]. The amended answer [Docket No. 136] incorporates the change in the defendants' averred facts regarding ownership of the assets described above and continues to maintain the single counterclaim for breach of contract.

Defendants have filed three motions for partial summary judgment on EchoStar's claims. The first motion, filed on April 1, 2009, seeks summary judgment on EchoStar's second, third, and fourth claims – the first two claims seek declaratory judgments, the third alleges unjust enrichment. *See* Defs.' First Summ. J. Mot. EchoStar filed a response to this motion. *See* Pl.'s Resp. in Opp'n to Defs.' Mot. for Partial Summ. J. [Docket No. 119] ("Pl.'s Resp. to First Summ. J. Mot."). Defendants filed a reply. *See*

Defs.' Reply in Supp. of Mot. for Partial Summ. J. on Pl.'s Second, Third & Fourth Claims [Docket No. 124] ("Defs.' Reply to First Summ. J. Mot.")

Defendants' second motion for summary judgment, filed on May 29, 2009, seeks summary judgment on EchoStar's seventh, eleventh, and twelfth claims, which respectively allege a fraudulent transfer, conspiracy to make a fraudulent transfer, and the aiding and abetting of a fraudulent transfer.  *See* Defs.' Mot. for Partial Summ. J. on Pl.'s Seventh, Eleventh & Twelfth Am. Claims [Docket No. 137] ("Defs.' Second Summ. J. Mot.").  EchoStar filed a response.  *See* Pl.'s Resp. in Opp'n to Defs.' Mot. for Partial Summ. J. [Docket No. 142] ("Pl.'s Resp. to Second Summ. J. Mot.").  Defendants filed a reply.  *See* Defs.' Reply in Supp. of Mot. for Partial Summ. J. on Pl.'s Seventh, Eleventh & Twelfth Am. Claims ("Defs.' Reply to Second Summ. J. Mot.").

Defendants' third motion for summary judgment, filed on October 23, 2009, seeks summary judgment on EchoStar's fifth claim for relief, which asserts a claim for promissory estoppel.  Defs.' Mot. for Partial Summ. J. on Pl.'s Fifth Claim for Relief [Docket No. 175] ("Defs.' Third Summ. J. Mot.").  EchoStar filed a response.  Pl.'s Resp. in Opp'n to Defs.' Mot. for Partial Summ. J. on Pl.'s Fifth Claim for Relief [Docket No. 176] ("Pl.'s Resp. to Third Summ. J. Mot.").  Defendants filed a reply. *See* Defs.' Reply in Supp. of Their Mot. for Partial Summ. J. on Pl.'s Fifth (Promissory Estoppel) Claim [Docket No. 177] ("Defs.' Reply to Third Summ. J. Mot.").  Each of defendants' three summary judgment motions is fully briefed and ripe for disposition.[1]

_____

[1]EchoStar also filed a motion for summary judgment of its own [Docket No. 117]. That motion is addressed in a separate order.

## II.  ANALYSIS

### A.  Legal Standard – Summary Judgment

According to Federal Rule of Civil Procedure 56, a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears the initial burden of showing the absence of a genuine dispute concerning a material fact in the case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  However, to be

clear, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

### B. EchoStar's Claims

#### 1. EchoStar's Second & Third Claims – Declaratory Judgment

EchoStar's second and third claims for relief seek declarations from the Court that

> Sparks and Kraft are general partners of Splash [Media Partners] and, as such, are liable for the debts and liabilities of Splash [Media Partners], or in the alternative, . . . that Sparks and Kraft expressly assumed or otherwise agreed to be held liable for Splash GP, Inc.'s obligations for Splash [Media Partners] as its general partner.

Pl.'s First Am. Compl. & Jury Demand [Docket No. 128] ("Am. Compl.") at 25; *see also* Am. Compl. at 12-14. Defendants seek summary judgment on both of these claims.

"In a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is

or could be sought." 28 U.S.C. § 2201(a) (2006). The preceding language of the Declaratory Judgment Act creates two separate requirements that parties seeking a declaratory judgment must meet. *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008). First, there must be an "actual controversy" at issue. *Surefoot LC*, 531 F.3d at 1240 (noting that the "actual controversy" requirement is tied to the case-or-controversy requirement of Article III of the United States Constitution).

In determining if an "actual controversy" exists, the Supreme Court noted that its previous decisions require

> that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and alteration marks omitted). Stated otherwise, "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127.

Once a district court satisfies itself that an "actual controversy" exists, the Court then turns to the second requirement under the Declaratory Judgment Act. This step embraces the permissive language of the Act – that a district court "*may* declare the rights and other legal relations." 28 U.S.C. § 2201(a) (emphasis added). A district court must consider several case-specific factors when deciding whether to exercise its

authority to issue a declaratory judgment.  *Surefoot*, 531 F.3d at 1240.  These various "equitable, prudential, and policy arguments" weigh on the Court's discretionary decision to either entertain or dismiss a declaratory judgment claim.  *MedImmune*, 549 U.S. at 136.

The Tenth Circuit has provided a non-exhaustive list of factors for district courts to consider in this exercise: (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; (4) whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.  *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

While the theories underlying EchoStar's second and third claims are questionable, there exists an actual controversy in this case that satisfies the Article III requirement.  The facts show that there is a substantial controversy between EchoStar and the defendants, that the parties have adverse legal interests, and that there is sufficient immediacy and reality to the controversy to warrant a potential issuance of a declaratory judgment.  *MedImmune*, 549 U.S. at 127.  Therefore, EchoStar's second and third claims clear the first declaratory judgment threshold.

Although not as clear, EchoStar's second and third claims also satisfy the various equitable, prudential, and policy considerations set forth by the Tenth Circuit under the second threshold.  Under the first factor from *Mhoon*, the Court notes that the

8

declarations sought by EchoStar may very well have the effect of settling matters of controversy presented here. Similarly, under the second factor, the declarations may serve a useful purpose in clarifying the legal relations at issue. With respect to the third factor, EchoStar's claim does not appear to be motivated by considerations of res judicata or other procedural fencing. Turning to the fourth discretionary factor, EchoStar's claims for declaratory relief produce no apparent friction between federal and state courts.

The fifth discretionary factor – whether there is an alternative remedy which is better and more effective – exposes the fact that EchoStar's requested declarations appear to be poor alternatives to piercing defendants' limited liability protections, which EchoStar seeks to do in its tenth claim for relief. However, the Court finds that the *Mhoon* factors, when weighed and considered as a whole, argue in favor of exercising the Court's discretion to consider issuing declarations on EchoStar's second and third claims for relief.

The Court now turns to the merits of EchoStar's second and third claims for relief. According to the Texas law in effect at the time the controversies arose – which the parties appear to concede applies to the partnership issues[2] –

> [e]xcept as provided by Subsection (d) of this section, a limited partner is not liable for the obligations of a limited partnership unless the limited partner is also a general partner or, in addition to the exercise of the

---

[2] The parties also appear to agree that Colorado contract and tort law apply to the other claims in this case. The Court accepts and operates under the same premise. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

limited partner's rights and powers as a limited partner, the limited partner participates in the control of the business.

Tex. Civ. Stat. Ann. Art. 6132a-1 § 3.03(a) (West 2007).

As mentioned earlier, under the terms of the partnership agreement, defendants Kraft and Sparks are not general partners of Splash Media Partners. Nor is there evidence that they were general partners under some other version of the agreement. EchoStar argues that, because various tax filings list Kraft and Sparks as general partners of Splash Media Partners, a jury could find that they were in fact general partners. Defendants contend that these filings were incorrect and have since been corrected to reflect that Kraft and Sparks are limited partners. More importantly, however, EchoStar fails to cite any authority for the proposition that reports in tax filings by themselves could convert a limited partner into a general partner for all purposes, regardless of what the partnership agreement says. Therefore, neither this Court nor a jury would have a legal basis for finding that, based on the tax filings, defendants Kraft and Sparks were, in actuality, general partners of defendant Splash Media Partners.

EchoStar also claims that defendants Kraft and Sparks were de facto general partners of Splash Media Partners because they controlled the partnership and never informed EchoStar of their limited-partner status. On the notice issue, it is undisputed that the BTIMA lists Splash Media Partners as a limited partnership. It is also undisputed that the defendants made all of the necessary filings regarding the partnership with the Texas secretary of state. *See* Defs.' First Summ. J. Mot. at 3 ¶ 5; Defs.' First Summ. J. Mot., ex. 1 at 1; *see also* Tex. Civ. Stat. Ann. Art. 6132a-1 § 2.01 (West 2007) (describing filing requirements). "The purpose of the filing requirements is

to provide notice to third persons dealing with the partnership of the essential features of the partnership arrangement." *Brewer v. Tehuacana Venture, Ltd.*, 737 S.W.2d 349, 352 (Tex. App. - Hous. 1987) (citing *Garrett v. Koepke*, 569 S.W.2d 568, 570 (Tex. Civ. App. 1978). Therefore, the fact that Kraft and Sparks never specifically informed EchoStar that they were limited partners is immaterial; the filings with the secretary of state provided EchoStar with constructive notice of that fact. *Cf. Carhart & Bro. v. Killough & Moore*, 1881 WL 9138, at *1 (Tex. Ct. App. 1881) ("The primary object of our statute with reference to limited partnerships was to furnish parties a means of giving constructive notice of the arrangement between the partners restricting the liability of some of them.").

Irrespective of compliance with the filing requirements, under Texas law a limited partner may be liable for the obligations of a limited partnership if, "in addition to the exercise of the limited partner's rights and powers as a limited partner, the limited partner participates in the control of the business." Tex. Civ. Stat. Ann. Art. 6132a-1 § 3.03(a) (West 2007). However, there is an important exception to this rule: "if the limited partner does participate in the control of the business, the limited partner is liable only to persons who transact business with the limited partnership reasonably believing, based on the limited partner's conduct, that the limited partner is a general partner." Tex. Civ. Stat. Ann. Art. 6132a-1 § 3.03(a) (West 2007).

There is no evidence that anyone associated with EchoStar believed, reasonably or otherwise, that Sparks and Kraft were general partners of Splash Media Partners or, put otherwise, that Sparks and Kraft were personally liable for the debts and liabilities of Splash Media Partners. In fact, it is undisputed that "[t]here is no letter, email, or other

form of communication by EchoStar to any Defendant prior to this lawsuit in which EchoStar asserted that Kraft or Sparks is a general partner of [Splash Media] Partners, that EchoStar believed either to be a [Splash Media] Partners' general partner, or that EchoStar believed either to be personally liable under the BTIMA." *See* Defs.' First Summ. J. Mot. at 4 ¶ 10, *admitted at* Pl.'s Resp. to First Summ. J. Mot. at 3 ¶ 10. Prior to the initiation of this litigation, the evidence shows that EchoStar did not consider in any way the partnership structure of Splash Media Partners. *See, e.g.*, Defs.' First Summ. J. Mot. at 4 ¶¶ 11-13, *admitted at* Pl.'s Resp. to First Summ. J. Mot. at 3 ¶¶ 11-13. As a result, defendants meet their initial burden at summary judgment by identifying the lack of evidence supporting an essential element of EchoStar's second claim, the element being EchoStar's reasonable belief that Sparks and Kraft were general partners of Splash Media Partners or should be treated as such. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

The burden then shifts to EchoStar to establish, at a minimum, an inference of the presence of this element. *Bausman*, 252 F.3d at 1115. EchoStar's only statement that it believed Kraft and Sparks were general partners of Splash Media Partners is contained in the first amended complaint: "Based upon Kraft's and Sparks' conduct, EchoStar reasonably believe [sic] that Kraft and Sparks are general partners of Splash [Media Partners]."[3] Am. Compl. ¶ 48. However, Rule 56 clearly states that a

---

[3] The true import of this averment is uncertain. For example, if, with the typographical error corrected, the statement reads that EchoStar presently *believes* that Kraft and Sparks are general partners of Splash Media Partners, then it would have far less impact than a statement that EchoStar *believed* that to be the case at the time the BTIMA was signed.

nonmoving party may not rest solely on the allegations in the pleadings and, instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).

In meeting its burden, EchoStar only marshals testimony that avoids or, at best, obscures the question. For example, EchoStar notes that "[n]o person affiliated with EchoStar has testified that Sparks and Kraft informed EchoStar that they were limited partners of Splash Media Partners or that they had actual knowledge regarding whether or not Sparks and Kraft are limited partners of Splash Media Partners." Pl.'s Resp. to First Summ. J. Mot. at 5 ¶ 7 (citing ex. 8 (Arnold Dep.) at 140 l. 20 to 141 l. 23; ex. 9 (Jackson Dep.) at 26 ll. 14-20, 32 l. 20 to 33 l. 2; ex. 7 at 50 ll. 8-14, 61, ll. 6-23; ex. 10 (Schwartz Dep.) at 41 ll. 9-15, 42 ll. 4-13, 69, ll. 6-21; ex. 11 (Robinson Dep.) at 37 ll. 7-14, 45 ll. 1-10, 45 l. 24 to 46 l. 6, 72 ll. 3-14; ex. 12 (Schwartz Aff.) at ¶ 6).

As discussed previously, the relevant question is whether EchoStar reasonably believed that Sparks and Kraft were general partners of Splash Media Partners. Whether or not EchoStar was specifically informed of Kraft's and Sparks' status is irrelevant, as is EchoStar's actual knowledge of the status. Furthermore, the standard is a subjective one. Therefore, it does not matter whether an objective outside observer would reasonably believe that Kraft and Sparks were general partners. Instead, there must be evidence that: 1) EchoStar believed Kraft and Sparks were general partners and 2) that such a belief was reasonable.

None of the evidence cited by EchoStar contains a straightforward statement that EchoStar actually believed that Kraft and Sparks were general partners. Instead, EchoStar dances around the issue by claiming, for example, that "EchoStar believed

that Kraft and Sparks were the only partners in Splash Media Partners." Pl.'s Resp. to First Summ. J. Mot. at 6 ¶ 12 (citing Pl.'s Resp. to First Summ. J. Mot., ex. 11 (Robinson Dep.) at p. 90 lines 18-25 to p. 92 lines 1-11). The underlying testimony cited by EchoStar in support of this statement indicates no understanding whatsoever by EchoStar or its agents regarding Kraft's and Sparks' partner status or their potential liability. Therefore, EchoStar has failed to show that there is a material issue of fact for trial with respect to whether Kraft and Sparks are or should be treated like general partners. EchoStar's requested declaration is precluded on its substance and defendants are entitled to judgment as a matter of law on EchoStar's second claim.

EchoStar's third claim shares a similar fate on the merits. EchoStar argues that Sparks and Kraft "expressly assumed or otherwise agreed to be held liable" for the obligations of Splash GP, Inc., the general partner of Splash Media Partners. Pl.'s Resp. to First Summ. J. Mot. at 14. According to Texas corporate law,

> [a] holder of shares, an owner of any beneficial interest in shares . . . shall be under no obligation to the corporation or to its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory . . . ."

Tex. Civ. Bus. Corp. Act, Art. 2.21 § A-A(2) (West 2007). There is a stated exception to this general rule for those instances where "the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate . . . ." Tex. Civ. Bus. Corp. Act, Art. 2.21 § A-A(2) (West 2007).

14

EchoStar does not allege that Kraft's and Sparks' liability results because they "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate."[4]  Instead, EchoStar alleges that the basis of Kraft's and Sparks' liability is their express assumption or agreement to that liability.  This claim appears to be based upon the Texas statute, which states that

> [t]he liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise, *except that nothing contained in this article shall limit the obligation of a holder, owner, subscriber, or affiliate to an obligee of the corporation when . . . the holder, owner, subscriber, or affiliate has expressly assumed, guaranteed, or agreed to be personally liable to the obligee for the obligation* . . . .

Tex. Civ. Bus. Corp. Act, Art. 2.21 § B-B(1) (West 2007) (emphasis added).  According to EchoStar,

> Kraft and Sparks expressly assumed [Splash GP, Inc.'s] obligations when they (i) made [Splash GP, Inc.] liable for Splash Media Partners' debts, (ii) never capitalized either company, and (iii) misrepresented Splash Media Partners' true financial condition; hence rendering Splash Media Partners' performance of the BTIMA impossible and hindering payment to its creditor EchoStar.

Pl.'s Resp. to First Summ. J. Mot. at 15.  These examples could represent, at most, implied assumptions.  They do not qualify as "express" assumptions under any reasonable interpretation of the word.  *Cf.* Merriam-Webster's Collegiate Dictionary 442 (11th ed. 2007) (defining "express" to mean "directly, firmly, and explicitly stated").

---

[4] The Court dismissed EchoStar's fraud claims with prejudice.  *See* Order [Docket No. 190].

Therefore, as was the case with the second claim, EchoStar has failed to show that there is a material issue of fact for trial with respect to whether Kraft and Sparks expressly assumed the obligations of Splash GP, Inc.  Defendants are entitled to judgment as a matter of law on EchoStar's third claim.

### 2.  *EchoStar's Fourth Claim – Unjust Enrichment*

EchoStar's fourth claim for relief is one for unjust enrichment, which EchoStar labels as an "Alternative to Breach of Contract."  Am. Compl. at 14.  Although this claim refers to "Defendants," it appears to be asserted against Splash Media Partners only. The alternative claim, EchoStar's first claim for relief, alleges a breach of contract by Splash Media Partners.  *See* Am. Compl. at 11 ¶¶ 39-43.  EchoStar's response to defendants' motion for summary judgment appears to operate under the assumption that the breach of contract claim and the unjust enrichment claim are asserted against a single party, Splash Media Partners.  *See* Pl.'s Resp. to First Summ. J. Mot. at 18-20. The final pretrial order also supports the notion that the two claims are asserted against just one party.  *See* Final Pretrial Order [Docket No. 183] at 2-3.   Therefore, the Court considers EchoStar's unjust enrichment claim to be asserted against Splash Media Partners only.

An unjust enrichment claim requires a showing of three elements: "that (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying."  *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).  Defendant Splash Media Partners argues that the "Colorado law is clear that 'a party cannot recover for unjust enrichment

by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract.'" Defs.' First Summ. J. Mot. at 16 (quoting *Interbank Investments, LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003)) (emphasis omitted). EchoStar does not contest this statement of the law. Nor does EchoStar deny that there is an express contract covering the same subject matter as its unjust enrichment claim. Instead, EchoStar argues that it "asserts its unjust enrichment claim as an alternative theory for recovery . . . in the event that the BTIMA fails as an express contract." Pl.'s Resp. to First Summ. J. Mot. at 19. EchoStar argues that defendants have challenged the enforceability of the BTIMA because "[d]efendants assert as affirmative defenses that EchoStar's claims are barred by, *inter alia*, lack of consideration, and/or failure of conditions." Pl.'s Resp. to First Summ. J. Mot. at 19. The court in *Interbank Investments*, however, rejected this argument, holding that "[a]lternative pleading . . . does not limit the principle that an express contract precludes an implied contract on the same subject matter." 77 P.3d at 817. Thus, the fact that EchoStar's breach of contract claim may fail does not allow EchoStar to plead unjust enrichment in the alternative. *Interbank Investments* explained the rationale for this rule:

> If the threshold for judicial implication of a quasi-contract became the adequacy of the remedy under an express contract, rather than the enforceability of that contract, the outcome would be determinable only on a case-by-case basis, after all of the evidence had been presented, and without either predictability or precise standards. *Cf. Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256 (Colo. 2000) (economic loss rule promotes the predictability of contracts by allowing the parties to allocate loss and risk and decrease their uncertainty on future liability). Moreover, failure to prove actual damages could become a litigation tactic available

when a party perceives that unjust enrichment might be more favorable
than the remedy provided by an express contract.

*Interbank Investments*, 77 P.3d at 818-819.

Defendants are also entitled to summary judgment on EchoStar's fourth claim for
relief due to EchoStar's failure to present facts to support the second element of an
unjust enrichment claim, namely, that Splash Media Partners received a benefit at
EchoStar's expense following EchoStar's termination of the BTIMA. Therefore,
because there is an express contract covering the same subject matter as the unjust
enrichment claim and because EchoStar has not shown any benefit to defendants after
EchoStar's termination of the BTIMA, EchoStar's unjust enrichment claim may not
proceed and summary judgment is appropriate.

### 3.  EchoStar's Fifth Claim – Promissory Estoppel

The analysis of EchoStar's promissory estoppel claim closely parallels the
analysis of the unjust enrichment claim. EchoStar asserts promissory estoppel as an
"alternative" to both the breach of contract claim and the unjust enrichment claim. *See*
Am. Compl. at 14. By operation of the same reasoning set forth in the unjust
enrichment discussion, EchoStar is asserting the promissory estoppel claim against
Splash Media Partners only. Splash Media Partners argues that, because promissory
estoppel is an alternative to traditional contract formation, a plaintiff may not assert
such a claim where an enforceable contract exists. Defs.' Third Summ. J. Mot. at 4.

Splash Media Partners is correct that, "promissory estoppel is applicable only in
the absence of an otherwise enforceable contract. The alternative remedy of
promissory estoppel is never reached when there has been mutual agreement by the

parties on all essential terms of a contract." *Corum Real Estate Grp., Inc. v. Blackrock Realty Advisors, Inc.*, Nos. 09-cv-01680-DME-MEH, 09-cv-02804-DME-BNB, 2010 WL 1957226, at *8 (D. Colo. May 14, 2010) (citing *Scott Co. of Cal. v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1992) (omission marks and emphasis omitted); *see also Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007) ("Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract.").

EchoStar advances the same arguments in defense of its promissory estoppel claim that it did with respect to its unjust enrichment claim. For the same reasons, this defense is unavailing. A mutually agreed-upon, and thus enforceable, contracts exists regarding the same subject matter. Therefore, in addition to its breach of contract claim, EchoStar may not also assert a claim for promissory estoppel. Defendants are entitled to judgment as a matter of law on this claim.

### 4. EchoStar's Seventh Claim – Fraudulent Transfer

EchoStar bases its seventh claim on two sections of the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), Colo. Rev. Stat. §§ 38-8-101 to 38-8-112 (2010), which the parties appear to concede is applicable. First, EchoStar cites subsections (a) and (b) of Colorado Revised Statutes § 38-8-105(1):

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a)    With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b)     Without receiving a reasonably equivalent value in exchange for
        the transfer or obligation . . . .

EchoStar also invokes Colorado Revised Statutes § 38-8-106, which states:

A transfer made or obligation incurred by a debtor is fraudulent as to a
creditor whose claim arose before the transfer was made or the obligation
was incurred if the debtor made the transfer or incurred the obligation
without receiving a reasonably equivalent value in exchange for the
transfer or obligation and the debtor was insolvent at that time or the
debtor became insolvent as a result of the transfer or obligation.

A transfer made by a debtor is fraudulent as to a creditor whose claim
arose before the transfer was made if the transfer was made to an insider
for an antecedent debt, the debtor was insolvent at that time, and the
insider had reasonable cause to believe that the debtor was insolvent.

Colo. Rev. Stat. § 38-8-106(1) & (2) (2010) (internal numbering omitted).

Defendants claim that EchoStar's fraudulent transfer claim fails because Splash

Media Partners never owned and, therefore, never transferred the assets at issue.

Under CUFTA, "'[t]ransfer' means every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with an asset or an

interest in an asset, and includes payment of money, release, lease, and creation of a

lien or other encumbrance."  Colo. Rev. Stat. § 38-8-102(13) (2010).  For purposes of

CUFTA,

[a] transfer is made:

(I)     With respect to an asset that is real property other than a fixture,
        but including the interest of a seller or purchaser under a contract
        for the sale of the asset, when the transfer is so far perfected that a
        good-faith purchaser of the asset from the debtor against whom
        applicable law permits the transfer to be perfected cannot acquire
        an interest in the asset that is superior to the interest of the
        transferee; and

(II)    With respect to an asset that is not real property or that is a fixture,
        when the transfer is so far perfected that a creditor on a simple

20

> contract cannot acquire a judicial lien otherwise than under this
> article that is superior to the interest of the transferee.

Colo. Rev. Stat. § 38-8-107(1) (2010).  However, "[a] transfer is not made until the

debtor has acquired rights in the asset transferred."  Colo. Rev. Stat. § 38-3-107(4)

(2010).  Defendants essentially argue that, because Splash Media Partners never

acquired rights in any assets, it could not transfer those rights.

EchoStar disagrees, claiming that Splash Media Partners, at one time, owned

several assets including Traders Television Network ("TTV"), a $5,000,000 production

studio, all TTV related assets, and a $100,000 deposit paid to EchoStar at the signing

of the BTIMA.  According to EchoStar, Splash Media Partners' ownership of these

assets is evidenced by various representations of defendants' Kraft and Sparks.

Defendants have met their initial burden under Rule 56 by identifying a lack of

evidentiary support that a transfer occurred – an essential element of EchoStar's

fraudulent transfer claim.  *See Bausman v. Interstate Brands Corp.*, 252 F.3d 1111,

1115 (10th Cir. 2001); *cf. In re Grandote Country Club Company, Ltd.*, 252 F.3d 1146,

1152 (10th Cir. 2001) (explaining that without a transfer, there can be no CUFTA

violation).  There is not a single pre-litigation document that supports EchoStar's claim

that Splash Media Partners owned the assets in question.  For example, no document

shows that Splash Media Partners owned, transferred, leveraged, licensed, reported, or

registered TTV.  No deed, deed of trust, tax assessment, or insurance policy has been

produced that demonstrates that Splash Media Partners owned the $5,000,000

production studio.  No bank accounts, accounts payable or receivable ledgers, or other

financial statements are in the record which show Splash Media Partners owned any of

the assets in question. In fact, as EchoStar itself repeated points out, one set of documents that could potentially demonstrate ownership, Splash Media Partners' tax returns, shows no assets listed. *See, e.g.*, Pl.'s Resp. to Second Summ. J. Mot. at 5 ¶ 12. Therefore, the burden shifts to EchoStar to establish, at a minimum, an inference of the presence of this essential element of its fraudulent transfer claim. *Bausman*, 252 F.3d at 1115.

Rather than traditional evidence of ownership, EchoStar relies on the representations of defendants Kraft and Sparks. EchoStar first cites the affidavit testimony of EchoStar's National Accounts Manager, Robert Schwartz. Mr. Schwartz testified that:

> The Defendants' [sic] entered into a Business Television Integrator Master Agreement ("BTIMA") with EchoStar to broadcast TTV in December 2004. Prior to that time period the Defendants Kraft and Sparks notified me that the BTIMA would be with a new company they created; Splash Media. I was informed that Splash Media did own the rights to and broadcast TTV. I was also informed that Splash Media was the company established for broadcast, distribution, and sales of TTV. In addition, Defendants Kraft and Sparks told me that Splash Media was building a multi-million dollar studio for creating TTV content that would be broadcast by EchoStar. Under the terms of the BTIMA, Splash Media was required to make payments to EchoStar in exchange for EchoStar [sic] broadcasting TTV. Defendants Kraft and Sparks assured me that Splash Media would obtain the money for these payments from income, sales, and broadcast of TTV.

Pl.'s Resp. to Second Summ. J. Mot., ex. 1 (Schwartz Aff.) ¶ 5. Mr. Schwartz's imprecise language is not sufficient to create a triable question of fact. He speaks only of "Splash Media." While one could infer from the document as a whole that he is speaking of Splash Media Partners, he also could be referring to Splash Media, L.P., the party which defendants claim is the actual owner of the assets. In fact, in October 2004, defendant Kraft sent an announcement to Mr. Schwartz which indicated that

Splash Media, L.P. would be producing, broadcasting, and distributing television content and would construct a audio/video studio.  Pl.'s Resp. to Second Summ. J. Mot., ex. 3.  In light of EchoStar's willingness to parse words in this litigation, vague or ambiguous testimony will not defeat a motion for summary judgment.  *Cf. Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1234 (10th Cir. 2008) ("Plaintiffs cannot survive summary judgment by simply submitting their own ambiguous affidavits and then arguing this ambiguity requires a trial.").

The second representations upon which EchoStar relies in arguing that a genuine issue of fact remains for trial are the defendants' preliminary representations in this litigation.  During the first eleven months of the pendency of this case, defendants stated that defendant Splash Media Partners owned the various assets.  Defendants made these statements in their answer and counterclaim, discovery responses, and elsewhere.  Then, in November 2008, defendants reported that they discovered these claims of ownership were in error and that, in truth, non-party Splash Media, L.P. had been the owner all along.

EchoStar argues that defendants' earlier statements should be binding as judicial admissions.  "Judicial admissions are formal admissions which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."  *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993), *modified on other grounds*, 39 F.3d 1078 (10th Cir. 1994) (en banc), *cert. denied*, 514 U.S. 1063 (1995) (quoting *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)) (quotation mark and omission marks omitted); *see also*

*Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo. 1986).  Although judicial admissions are

binding on the party making them, the rule is not absolute; their binding effect can be

abrogated where the statements are properly withdrawn or amended.  *See Missouri*

*Housing Development Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990) ("As a

rule, admissions in the pleadings are in the nature of judicial admissions binding upon

the parties, unless withdrawn or amended." (quotation, alteration, and omission marks

omitted)); *Hicks v. United States*, 486 F.2d 325, 329 (10th Cir. 1973) (suggesting that a

proper amendment could abrogate an alleged judicial admission); *see also Huey v.*

*Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) ("When a pleading is amended or

withdrawn, the superseded portion ceases to be a conclusive judicial admission . . . .").

Defendants amended their averments regarding Splash Media Partners' asset

ownership in an answer and counterclaim filed with leave of the Court.  *See* Order

[Docket No. 121] at 3.  Defendants also withdrew or corrected any contrary testimony

and discovery responses.  Therefore, defendants will not be bound by their original

averments under the doctrine of judicial admission.[5]

　　Even if defendants are not bound by the doctrine of judicial admission to their

initial representations regarding ownership, EchoStar contends that the earlier

statements create a genuine issue of fact regarding the ownership and subsequent

---

[5] This result is not unjust.  Fully informed of defendants' new factual allegations, EchoStar filed a motion to amend its complaint.  *See* Pl.'s Mot. to Amend the Compl. to Add Parties, Allegations and Claims [Docket No. 54].  Rather than joining Splash Media, L.P. as a defendant, EchoStar chose to pursue a fraudulent transfer claim apparently based solely on the changed representations regarding ownership of the assets.  EchoStar's amended complaint also added a claim to pierce the limited liability veil of Splash G.P., Inc.

transfer of the assets.  EchoStar is correct that, as a general matter, a party is able to refer to its opponents' contradictory pleadings as evidence that the original factual recitation was correct.  *See Raulie v. United States*, 400 F.2d 487, 526 (10th Cir. 1968); *see Hartford Fire Ins. Co. v. Carter*, 196 F.2d 992, 996 (10th Cir. 1952) ("Ordinarily previous contradictory evidence of a party or a witness concerning which there could be an honest mistake, goes to the credibility of the evidence and is for the jury").

In order to prevent summary judgment on its claim, EchoStar must cite evidence from which a jury could reasonably conclude that a fraudulent transfer occurred.  This EchoStar has failed to do.  There is no evidence, other than defendants' withdrawn and corrected pleadings, that would provide any basis for a jury to conclude that there had been a fraudulent transfer.  As a predicate to any transfer, the transferor must first possess the allegedly transferred rights.  Colo. Rev. Stat. § 38-8-107(4) (2010) ("A transfer is not made until the debtor has acquired rights in the asset transferred.").  Once again, except for withdrawn and corrected pleadings, there is no proof that Splash Media Partners ever owned the assets in question.  The fact that defendants may have once, through litigation, said so is not competent evidence, standing alone, that it was in fact the case.  EchoStar does not cite any authority for the proposition that such representations, by themselves, have any impact on actual ownership.

Misinformed or even deliberate misstatements about ownership to a third party would not effect a transfer of title.  *Cf. Carter*, 196 F.2d at 996 (holding that parties' incorrect statement regarding ownership was not determinative where facts demonstrated otherwise).  In other words, Splash Media Partners would not become the owner of the TTV, the production studio, and the other assets simply because the

defendants stated that it was. Therefore, defendants' statements, by themselves, are not material and could not lead a reasonable jury to conclude that there was a fraudulent transfer.

The one asset which deserves additional discussion is the $100,000 that was paid to EchoStar as a deposit upon the signing of the BTIMA. There is a lack of evidence that this asset was transferred. However, this claim is especially suspect. While EchoStar's theory here is not entirely clear, what is known is that this money was transferred to EchoStar. EchoStar does not explain how it believes it may assert a fraudulent transfer claim based on a transfer to itself. The purpose of CUFTA is to protect creditors. *Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 764 (Colo. App. 2000) (citing Prefatory Note, Uniform Fraudulent Transfer Act, Colo. Rev. Stat. § 38-8-101 (1999)). An individual creditor needs no protection from transfer of assets to itself. Therefore, in addition to the lack of evidence of an actual transfer, EchoStar's fraudulent transfer claim related to the $100,000 payment fails because it fails to state a claim under CUFTA.

In sum, EchoStar has failed to show that there is a triable issue of fact regarding its fraudulent transfer claim and, as a result, defendants are entitled to summary judgment.

### 5. EchoStar's Eleventh Claim – Conspiracy to Commit Fraudulent Transfer

EchoStar's civil conspiracy claim is closely tied to its fraudulent transfer claim.

There are five elements required to establish a civil conspiracy in Colorado. There must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of

the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.

*Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989) (quoting *More v. Johnson*, 568 P.2d 437, 439-40 (1977)) (alteration marks omitted).  According to EchoStar's amended complaint, the unlawful overt act, which is required by the fourth conspiracy element, is the defendants' allegedly fraudulent transfer of the assets of Splash Media Partners.  As a result of the previous discussion and the conclusion that there is insufficient evidence of a transfer, the fourth element of EchoStar's conspiracy claim is not satisfied.  This claim fails as a matter of law, entitling defendants to summary judgment.

### 6. EchoStar's Twelfth Claim – Aiding and Abetting Fraudulent Transfer

For the same reasons that EchoStar's conspiracy claim falters, so too does its aiding and abetting claim.  "Liability for aiding or abetting a tortious act will be found if the party whom the defendant aids performs a wrongful act that causes an injury, the defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and the defendant knowingly and substantially assists the principal violation."  *Holmes v. Young*, 885 P.2d 305, 308 (Colo. App. 1994). Here, as with the conspiracy claim, the lack of an identifiable transfer by the defendants means that the predicate wrongful act did not occur.  As a result, this claim also fails as a matter of law, entitling defendants to summary judgment.

## III. CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that defendants' motion for partial summary judgment on plaintiff's second, third, and fourth claims [Docket No. 116] is GRANTED.  Summary judgment shall enter on plaintiff's second, third, fourth claims.  It is further

**ORDERED** that defendants' motion for partial summary judgment on plaintiff's seventh, eleventh, and twelfth amended claims [Docket No. 137] is GRANTED.  Summary judgment shall enter on plaintiff's seventh, eleventh, and twelfth claims.  It is further

**ORDERED** that defendants' motion for partial summary judgment on plaintiff's fifth claim for relief [Docket No. 175] is GRANTED.  Summary judgment shall enter on plaintiff's fifth claim.  It is further

**ORDERED** that any final judgment entered upon resolution of all claims against all parties in this case shall reflect the rulings in this order.

DATED September 29, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge